# IN THE SUPREME COURT OF IOWA

No. 21–0243

Submitted December 14, 2021—Filed March 11, 2022

**IN THE INTEREST OF T.F. and T.F.,** Minor Children.

**T.F.,** Father,

Appellant,

**THE OMAHA TRIBE OF NEBRASKA & IOWA,**

Intervenor–Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Susan Cox, District Associate Judge.

Father and the Tribe appeal the juvenile court's order terminating parental rights, arguing that the juvenile court erred in considering "the best interests of the child" in a transfer of jurisdiction motion, in violation of the federal and state Indian Child Welfare Acts. **DECISION OF COURT OF APPEALS VACATED; JUVENILE COURT JUDGMENT REVERSED AND REMANDED WITH INSTRUCTIONS.**

Appel, J., delivered the opinion of the court, in which Christensen, C.J., and Mansfield and Oxley, JJ., joined. McDermott, J., filed an opinion concurring in part and dissenting in part, in which Waterman and McDonald, JJ., joined.

Jonathan M. Causey (argued) of Causey & Ye Law, P.L.L.C., Des Moines, for appellant Father.

Alexis Zendejas (argued), Macy, Nebraska, for intervenor–appellant the Omaha Tribe of Nebraska & Iowa.

Thomas J. Miller, Attorney General, and Mary A. Triick (argued), Assistant Attorney General, for appellee State.

Cathleen J. Siebrecht (argued) of Siebrecht Law Firm, Des Moines, and Erin E. Mayfield (until withdrawal) of the Youth Law Center, Des Moines, attorney and guardian ad litem for minor children.

**APPEL, Justice.**

This case involves an appeal by a parent and the Omaha Tribe of Nebraska & Iowa (Tribe) from an order terminating parental rights with respect to two "Indian"[1] children under the Indian Child Welfare Act, 25 U.S.C. § 1903(4) (ICWA), and Iowa Code chapter 232B (2021) (Iowa ICWA). The State commenced child-in-need-of-assistance (CINA) proceedings involving the older child in November 2018 and the younger child on February 19, 2019. The Tribe filed a petition for intervention in the state court proceedings, which was granted on February 20. After the State filed a petition to terminate parental rights in January 2020, the Tribe filed a motion to transfer the case to tribal court.

The juvenile court held a two-day hearing in July 2020. In September, the juvenile court denied the motion to transfer, reasoning, among other things, that "good cause" was present to deny the transfer as it would not be in the best interests of the children. After notice and hearing, the juvenile court terminated the parental rights of both parents in February 2021.

The Tribe and Father appealed. They argue, among other things, that the motion to transfer was improperly denied by the juvenile court under the state and federal ICWA statutes. They argue that the question of whether there is good cause to deny transfer to tribal courts under both statutes focuses narrowly on forum-non-conveniens-type considerations. Father and the Tribe further argue

---

[1]"[W]e 'use[] terms such as "Indian country," and demarcations such as "Indian" and "non-Indian" only for purposes of consistency with the existing legal framework and nomenclature.' " *State v. Bear*, 969 N.W.2d 499, 500 n.1 (Iowa 2021) (second alteration in original) (quoting *State v. Stanton*, 933 N.W.2d 244, 247 n.1 (Iowa 2019)).

that the juvenile court erred in considering the larger substantive issue of "the best interests of the child" in the transfer calculus.

For the reasons expressed below, we conclude that the juvenile court erred in considering the best interests of the children on the narrow question of transfer to the tribal court. We reverse the juvenile court and remand the case for transfer to the tribal court.

**I. Procedural and Factual Background.**

**A. Procedural Background.** Both T.F. (older T.F.) and T.F. (younger T.F.) are "Indian child[ren]" under 25 U.S.C. § 1903(4). The two children were removed at different times from their parents. Both Father and Mother are enrolled members in the Tribe. Shortly after the younger T.F. was removed, the Tribe filed a motion to intervene in the CINA proceedings in the state court. The motion was granted on February 20. The two children were adjudicated as CINA on March 31 and April 1. Disposition occurred for both children on April 24 with a review hearing on July 18.

A permanency order was entered on January 20, 2020. Shortly thereafter, the State filed its petition for termination of parental rights on January 23. The Tribe filed a motion to transfer the matter to the Omaha Tribe Juvenile Court on January 30. On February 25, the Tribe filed a motion to intervene in the termination-of-parental-rights proceedings and a petition to transfer the case to tribal court.

**B. Motion to Transfer.** The juvenile court held a hearing on the motion to transfer via video conference on June 19 and July 2. At the hearing, the Tribe

called Mosiah Harlan as a Qualified Expert Witness (QEW). He testified that tribal customs and traditions do not align with termination of parental rights. He further testified that the Tribe would be willing to work with the current foster placement if the foster parents worked with the Tribe.

The foster mother testified at the transfer hearing. She testified generally that the children were doing well. She stated that the foster family had sought to familiarize themselves with the heritage of the children including visiting the Sioux City reservation, reading tribal books, and visiting a museum in Washington D.C. According to the foster mother, the foster family would welcome help from the Tribe regarding preserving the children's heritage.

Father and Mother also testified. Father was incarcerated with a release date of February 2021. Mother testified that she had recently been committed for psychiatric care and was now in a treatment center. She testified she wanted the transfer to occur to give her more time to have the children returned to her custody.

The State argued that transfer should be denied because of the lack of responsibility by Mother and Father, the efforts of the foster parents to promote the children's Native American heritage, and the good relationship between the current professionals and the children. The guardian ad litem for the children joined the State in resisting the transfer of the case to tribal court.

On September 20, the juvenile court denied the motion to transfer. The juvenile court canvassed the history of the file in detail. The history generally revealed a lengthy drug and mental health history of Mother, drug abuse and

alcoholism of Father, and criminal history of both, including domestic violence by Father. The juvenile court canvassed unsuccessful efforts to place the children with the great grandmother and the great aunt, both of whom also belong to the Tribe. The juvenile court noted that the court appointed special advocate (CASA) for the children recommended that the parental rights of the parents be terminated and the children continue living with the foster parents.

In considering the transfer question, the juvenile court began its analysis by canvassing provisions of the Iowa ICWA and related caselaw. Citing unpublished court of appeals precedent, the juvenile court noted that the Iowa ICWA had a "dual purpose" of protecting the best interests of the child and preserving the Native American culture. *See In re E.D.*, No. 16–0829, 2016 WL 4379382, at *3 (Iowa Ct. App. Aug. 17, 2016) (unpublished table decision) (citing *In re D.S.*, 806 N.W.2d 458, 465 (Iowa Ct. App. 2011)).

The juvenile court proceeded to consider provisions of the Iowa ICWA related to the transfer of matters to tribal court. *See* Iowa Code § 232B.5(10)–(11), (15). The juvenile court noted that under these provisions of the Iowa ICWA, the children were not permitted to object to transfer. Yet, the juvenile court noted that in *In re J.L.*, 779 N.W.2d 481, 489 (Iowa Ct. App. 2009), the court of appeals held that the failure of the Iowa ICWA to permit children to challenge transfer to tribal court violated the children's procedural due process rights. In addition, the juvenile court noted that the *In re J.L.* court further concluded that by narrowly defining "good cause," the Iowa ICWA violated the substantive due

process rights of the children by not permitting them to argue that transfer of the matter was not in the children's best interest. *Id.* at 491–92.

The juvenile court found that good cause was properly raised by the children's guardian ad litem and by the county attorney. According to the juvenile court, once the good cause issue was raised, the burden shifted to the moving party to support the transfer of jurisdiction to the tribal court. In considering good cause, the juvenile court noted, but did not discuss, a federal regulation which provides that the court may not consider various reasons as "good cause" for resisting transfer, including "[w]hether transfer could affect the placement of the child" and "any negative perception of Tribal or BIA social services or judicial systems." 25 C.F.R. § 23.118(c)(3), (5) (2021).

Based on the record, the juvenile court found that it was in the children's best interest to deny the transfer for several reasons. First, the juvenile court found that services provided to the children and parents pursuant to the state court proceedings were excellent. The court noted that the older child suffered repeated trauma due to the parents' substance abuse, instability, and domestic violence. Transfer of the case to the tribal court would require the involvement of a new set of professionals, something that the juvenile court found would be cruel in light of the children's difficulty adjusting to strangers.

Second, the juvenile court concluded that the state court was best situated to litigate custody of the children and parental rights of the parents. The juvenile court noted that the proceedings in the state court were at an "advanced stage"

with a permanency order issued and that the petition to terminate parental rights had been on file for over five months.

Finally, the juvenile court recognized that while the children's placement was not in a Native American home, the foster parents have sought to continue the children's involvement with the Tribe and other Native American tribal cultures. As a result, the juvenile court believed that keeping the case in state court would not prevent the children from maintaining the vital relationship with the Tribe and would not "interfere with the policy that the best interest of an Indian child require that the child be placed in a foster or adoptive home that reflects the unique values of Indian culture."

**C. Juvenile Court Termination of Parental Rights.** The juvenile court held a termination hearing on December 9 and 10, 2020. Father attended from prison, while Mother did not attend. A number of witnesses testified at the termination hearing. Dr. Rudi Mitchell, a QEW, testified regarding the family and social order of the Tribe. He recounted the difficulty of the Tribe in maintaining its identity. He recommended a guardianship for the children. Mitchell, however, had not met the children, the parents, the social worker involved in the case, or the foster parents.

The foster mother testified at length. She generally recounted the positive development of the children. She testified about efforts to ensure that the children were connected with their culture, including research, reading books, visiting museums, and teaching the children to count in their native language.

Iowa Department of Human Services (DHS) worker April Hase testified. Among other things, she reviewed the file generally, outlined the chronic difficulties of the parents, the unsuccessful efforts to involve the great grandmother and great aunt in providing a safe environment for the children, and the difficulty of finding alternative placements for the children.

Father testified from prison regarding his minimal recent contact with the children. He testified that he believed in the Tribe's culture, customs, and beliefs. He challenged DHS's rendition of the history of the case. Father testified regarding his criminal history and unwillingness to comply with a no-contact order related to Mother.

The juvenile court on February 3, 2021, terminated the parental rights of both parents. The court amended the order several days later on February 7. The juvenile court canvassed the history of the case, finding that the parents were not in a position to resume caring for the children. The juvenile court further found that DHS provided the parents with active efforts under ICWA. Therefore, the juvenile court concluded that DHS went above and beyond in its effort to assist the family, including physically helping Mother pack and move her things and taking her to the courthouse so she could apply for a no-contact order against Father.

**D. Issues Raised on Appeal.** Father raises several issues for the court's review. Father claims that the juvenile court erred by denying the Tribe's request to transfer jurisdiction to the tribal court in violation of the federal and Iowa ICWA. Father further contests the juvenile court's order of termination of his

parental rights. Father claims that the termination of parental rights was flawed because the State failed to meet its burden under ICWA, and that the State failed to follow ICWA's mandates and provide active efforts.

The Tribe also appealed. Like Father, the Tribe contests the juvenile court's denial to transfer jurisdiction. The Tribe contends that the court erred by using the best interests of the child analysis to determine the jurisdiction issue. The Tribe also believes that the juvenile court erred in resting its transfer decision on impermissible factors.

The State does not contest Father's transfer of jurisdiction argument and instead argues Father's appeal was untimely. Additionally, the State urges the court to find that the denial of a motion to transfer a final appealable order rather than an interlocutory order. With respect to the termination order, the State believes active efforts have been provided and there was sufficient evidence to support termination of Father's parental rights.

The guardian ad litem supports the juvenile court's order terminating parental rights. The guardian ad litem first argues that Indian children have a due process right to object to a motion to transfer jurisdiction based on *In re J.L.*, 779 N.W.2d at 489. Specifically, the guardian ad litem points out that even though the Tribe intervened fairly early in the CINA proceedings, it did not ask for transfer of jurisdiction until the State filed its termination-of-parental-rights petition. The guardian ad litem contends that best interests of the children should be taken into account when deciding transfer of jurisdiction, and if situations require, it can override tribal or family interests. The guardian ad litem

further asserts that placement with either parent would cause emotional or physical damage to the children. The guardian ad litem also praises the current foster family's efforts to help the children stay connected to the Tribe. Lastly, the guardian ad litem argues that the Tribe fails to meet its burden in the motion to transfer.

**E. Decision of the Iowa Court of Appeals.** A 2–1 majority of the court of appeals affirmed the juvenile court. The majority noted that under the federal ICWA, the legislative history indicated that good cause to deny transfer was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child. *Chester Cnty. Dep't of Soc. Servs. v. Coleman*, 372 S.E.2d 912, 914 (S.C. Ct. App. 1988) (per curiam) (citing H.R. Rep No. 95–1386 (1978), *as reprinted in* 1978 U.S.C.A.N. 7530, 7544). The majority did note, however, that under the Bureau of Indian Affairs (BIA) guidelines, a good cause finding is similar to "a modified [(i.e. limited, narrow)] doctrine of forum non conveniens" analysis. Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38778, 38821 (June 14, 2016) (to be codified at 25 C.F.R. pt. 23).

The majority next surveyed the Iowa ICWA and the accompanying caselaw. It noted that under the Iowa ICWA, good cause to deny transfer was not defined. Consequently, the majority reasoned that the lack of definition of good cause in the Iowa ICWA meant that Iowa law was not limited by the federal ICWA considerations. The court of appeals cited to the *In re J.L.* decision and declared that the children were constitutionally entitled to challenge transfer and that

"nothing in [the Iowa ICWA] places maintaining the Indian culture above a child's rights or safety." 779 N.W.2d at 492.

Based on its interpretation of the interlocking state and federal law and the authority of *In re J.L.*, the majority proceeded to consider whether there was good cause to deny transfer. It concluded that there was. After recognizing that the juvenile court engaged in the proper analysis of the good cause question, the court of appeals majority upheld the denial of the motion to transfer the case to tribal court.

Additionally, the majority concluded that the juvenile court properly found that the State met its burden of showing "active efforts . . . designed to prevent the breakup of the Indian family" and that those efforts were unsuccessful. Iowa Code § 232B.5(19). The majority further affirmed the juvenile court's ruling that the grounds for termination of parental rights under the Iowa ICWA had been met and that the juvenile court properly heard and considered the testimony from a QEW. *Id.* § 232B.6(6)(*a*).

The court of appeals dissent found that under the Iowa ICWA, the "[b]est interest of the child" required the court to utilize "practices in accordance with the federal Indian Child Welfare Act." Iowa Code § 232B.3(2). This meant, according to the dissent, that Iowa law required courts to consider federal law in analyzing whether transfer to tribal court is in the best interests of the child.

In looking to federal law regarding the best interests of the child, the dissent cited the federal regulation titled, "How is a determination of 'good cause' to deny a transfer made?" 25 C.F.R. § 23.118(c). This regulation specifically

precludes a court from considering "[w]hether the . . . termination . . . is at an advanced stage," "[w]hether transfer could affect the placement of the child," "[t]he Indian child's cultural connections with the Tribe or its reservation," and also "any negative perception of Tribal or BIA social services." *Id.*

The dissent found that the juvenile court considered each of these grounds prohibited by the federal regulations. The dissent pointed out that the juvenile court explicitly cited in its order denying transfer due to the "advanced stage" of the proceedings, the foster parent's efforts to acculturate the children (which had implications for their current placement and cultural connections), and discussed the "excellent support services" provided to the children (implying that support services provided by the Tribe would be less advantageous).

The Tribe and Father sought further review, which we granted.

**II. Standard of Review.**

The standard of review of a termination-of-parental-rights proceeding is de novo. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). "Where, as here, the children are members of a U.S. Indian tribe, the provisions of Iowa Code chapter 232 governing children in need of assistance are modified by the ICWA." *In re A.E.*, 572 N.W.2d 579, 581 (Iowa 1997). We review statutory interpretations for correction of errors of law. *In re N.V.*, 744 N.W.2d 634, 636 (Iowa 2008). Constitutional challenges to a statute are reviewed de novo. *Wright v. Iowa Dep't of Corr.*, 747 N.W.2d 213, 216 (Iowa 2016).

**III. Jurisdictional Issues.**

**A. Timeliness of Appeal.** The State contends that Father's appeal is untimely. The juvenile court's amended order terminating parental rights was filed on February 21, 2021. Father's notice of appeal was not filed until sixteen days later, on February 23. Under Iowa Rule of Appellate Procedure 6.101(1)(*a*), the notice of appeal must be filed "within 15 days." Accordingly, Father's appeal was one day late.

The record reveals that the juvenile court filed the amended order at 8:54 p.m. on February 7, 2021, a Sunday night. According to Father's attorney, the order was not available to him until February 8. Father's attorney states he erroneously relied on February 8 as triggering the time period for filing the notice of appeal.

We recently considered a similar issue in *In re W.M.*, 957 N.W.2d 305 (Iowa 2021). In *In re W.M.*, we held that delayed appeals would be recognized in termination-of-parental-rights cases. *Id.* at 316. In *In re W.M.*, we noted that a delayed appeal would be available "only where the parent clearly intended to appeal and the failure to timely perfect the appeal was outside of the parent's control." *Id.* (quoting *In re A.B.*, 957 N.W.2d 280, 292 (Iowa 2021)). We further emphasized that the delay must be "no more than negligible" and would not prolong the appeal process. *Id.* (quoting *In re A.B.*, 957 N.W.2d at 292). In *In re W.M.*, we granted a delayed appeal that was two days late where the record showed the party intended to appeal and the delay was not caused by any act or

omission of the party. *Id.* at 317. Applying the criteria established in *In re W.M.*, we conclude that Father is entitled to file a late appeal in this case.

**B. Interlocutory or Final Order.** There is a second jurisdictional issue in this case. The State contends that the order of the juvenile court denying transfer should be considered a final order. By failing to timely appeal the final order, the State argues we lack jurisdiction to review this matter. The court of appeals, in an unpublished opinion, has held that a denial of transfer order does not dispose of all of the issues in the case and, as a result, is not a final appealable order. *In re E.D.*, 2016 WL 4379382, at *6.

We too conclude that a denial of transfer order is not an appealable final order. The Tribe and parents were not out of the case after the denial of transfer order in this case. A denial of a motion to transfer jurisdiction is akin to a ruling on forum non conveniens. Ordinarily, a denial of a motion to transfer based on forum non conveniens is not considered final. *See Carlenstolpe v. Merck & Co.*, 819 F.2d 33, 36–37 (2d Cir. 1987). We have stated in the context of juvenile matters that an order that is not a final decision is interlocutory. *In re W.D.*, 562 N.W.2d 183, 185–86 (Iowa 1997). We see no basis to dismiss this appeal as untimely on the ground that the order was interlocutory.

**IV. Overview of Federal ICWA and Iowa ICWA Related to Transfer of Jurisdiction From State Court to Tribal Court.**

**A. Introduction.** The crucial issue in this appeal is whether the juvenile court erred in refusing to transfer jurisdiction over the matter to the Tribe under 25 U.S.C. § 1911(b). In order to lay the foundation necessary to resolve this

question, we explore the statutory contours of the federal ICWA and the Iowa ICWA.

**B. Statutory Framework of Federal ICWA.**

1. *Overview of federal ICWA.* Starting in the 1970s, Congress became increasingly aware of a "wholesale removal of Indian children from their homes." Subcomm. on Indian Affs., 93d Cong., 2d Sess., 3 (1974) (statement of William Byler). Congressional hearings revealed that around 25% of the Native American children were removed from their families and placed in non-Native American foster and adoptive homes and institutions. *Id.* The removal of Native American children from their homes was believed to threaten the survival of the Native American tribes and their unique cultures.

Concerned about the removal of Native American children from their families, Congress enacted ICWA, 25 U.S.C. ch.21. In ICWA, Congress recognized that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children." *Id.* § 1901(3). In the legislation, Congress established federal standards that govern state court child custody proceedings involving Indian children.

Congress aimed, among other things, to give tribal courts exclusive jurisdiction over custody proceedings involving an Indian child. *See Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36 (1989). Congress believed "the best interests of an Indian child are served by ensuring tribal participation in placement and adoption proceedings, and that tribal participation in proceedings involving Indian children is necessary." Jennifer Nutt Carleton, *The Indian Child*

*Welfare Act: A Study in the Codification of the Ethnic Best Interests of the Child*, 81 Marq. L. Rev. 21, 27 (1997). The underlying premise of ICWA is that Native American tribes have a vital interest as a sovereign government to be included in the decision-making process regarding their children. *Id.*

ICWA "seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society." *Holyfield*, 490 U.S. at 37 (quoting H.R. Rep. No. 91–1386, 23 (1978)). ICWA ensures that the best interests of the child is understood in a context that reflects and respects Native American values and cultures. *In re D.M.*, 685 N.W.2d 768, 774 n.3 (S.D. 2004) (Konenkamp, J., concurring specially) ("The term 'best interest of the child' has a broadened meaning under ICWA, incorporating preservation of the Indian child's cultural and tribal identity, preferably within the jurisdiction of the child's tribe."). This is crucial because "the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 U.S.C. § 1901(5).

Congress declared that there are two overarching policies behind ICWA: "protect the best interests of Indian children," and "promote the stability and security of Indian tribes and families." *Id.* § 1902. To do so, Congress established "minimum Federal standards" for the removal and placement of Native American children, which have to "reflect the unique values of Indian culture." *Id.* Additionally, states are required to assist Native American tribes in the operation

of child and family service programs. *Id.* States are free to provide more protection, but not less. From this language, the idea of best interests of the child is intertwined with the best interests of the tribe and its cultural preservation.

2. *ICWA provision related to tribal court jurisdiction.* ICWA provides the tribes have exclusive jurisdiction over child custody proceedings when the Indian child resides or is domiciled within the reservation of the tribe. *Id.* § 1911(a). This case, however, involves a Native American not domiciled or residing within a reservation. Under this situation, ICWA provides that

> In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, *in the absence of good cause to the contrary*, *shall* transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe . . . .

*Id.* § 1911(b) (emphasis added). Additionally, ICWA grants the Indian child's tribe "a right to intervene at any point in the proceeding." *Id.* § 1911(c).

In addition to the statutory provision of 25 U.S.C. § 1911(b), regulations promulgated by the BIA have a substantially similar provision related to transfer of jurisdiction from a state court to a tribal court in juvenile matters:

> Upon receipt of a transfer petition from an Indian child's parent, Indian custodian, or Tribe, the State court must transfer the child-custody proceeding unless the court determines that transfer is not appropriate because one or more of the following criteria are met:
>
> (a) Either parent objects to such transfer;
>
> (b) The Tribal court declines the transfer; or
>
> (c) Good cause exists for denying the transfer.

25 C.F.R. § 23.117.

The statutory and regulatory provisions related to transfer of jurisdiction to tribal courts under ICWA do not provide a definition of "good cause." The BIA, however, has issued guidelines regarding the meaning of good cause in the statute related to transfer of jurisdiction. According to the BIA, "the legislative history of the Act states explicitly that the use of the term 'good cause' was designed to provide state courts with *flexibility* in determining the disposition of a placement proceeding involving an Indian child." Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67584 (Nov. 26, 1979) (emphasis added). While the BIA rejected the assertion that it had the power to promulgate regulations with binding effect, it did provide the following suggestions on interpreting the ICWA transfer provision in § 1911(b):

> (a) Good cause not to transfer the proceeding exists if the Indian child's tribe does not have a tribal court . . . .

> (b) Good cause not to transfer the proceeding may exist if any of the following circumstances exists:

> (i) The proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing.

> (ii) The Indian child is over twelve years of age and objects to the transfer.

> (iii) The evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the parties or the witnesses.

> (iv) The parents of a child over five years of age are not available and the child has had little or no contact with the child's tribe or members of the child's tribe.

(c) Socio-economic conditions and the perceived adequacy of tribal or Bureau of Indian Affairs social services or judicial systems may not be considered in a determination that good cause exists.

(d) The burden of establishing good cause to the contrary shall be on the party opposing the transfer.

*Id.* at 67591.

In addition to these guidelines, the regulations also set forth rules to determine good cause to deny the transfer of jurisdiction. Interestingly, the regulations emphasize what should *not* be included in the good cause determination:

(1) Whether the foster-care or termination-of-parental-rights proceeding is at an advanced stage if the Indian child's parent, Indian custodian, or Tribe did not receive notice of the child-custody proceeding until an advanced stage;

(2) Whether there have been prior proceedings involving the child for which no petition to transfer was filed;

(3) Whether transfer could affect the placement of the child;

(4) The Indian child's cultural connections with the Tribe or its reservation; or

(5) Socioeconomic conditions or any negative perception of Tribal or BIA social services or judicial systems.

25 C.F.R. § 23.118(c).

3. *Summary.* The federal ICWA and accompanying regulations and guidelines establish a framework for consideration of motions to transfer juvenile matters from state court to tribal court. Although good cause is not elaborated at length, both the statute and regulations state in some detail what is not good cause. Absent an objection to transfer or a showing of unavailability or substantial hardship with a tribal forum, transfer is to occur. Clearly, Congress

has an overall objective in enacting ICWA to establish a framework for the preservation of Native American families wherever possible.

## C. Overview of Provisions of Iowa ICWA.

1. *Overview of Iowa ICWA.* Iowa passed the Iowa Indian Child Welfare Act in 2003 to "clarify state policies and procedures regarding implementation" of the federal ICWA. Iowa Code § 232B.2. Section 232B.2 further states:

> It is the policy of the state to cooperate fully with Indian tribes and tribal citizens in Iowa in order *to ensure that the intent and provisions of the federal Indian Child Welfare Act are enforced.* . . . The state is committed to protecting the essential tribal relations and *best interest of an Indian child by promoting practices, in accordance with the federal Indian Child Welfare Act and other applicable law, designed to prevent the child's voluntary or involuntary out-of-home placement* and, whenever such placement is necessary or ordered, by placing the child, whenever possible, in a foster home, adoptive home, or other type of custodial placement *that reflects the unique values of the child's tribal culture and is best able to assist the child in establishing, developing, and maintaining a political, cultural, and social relationship with the child's tribe and tribal community.*

*Id.* (emphasis added). The Iowa Legislature enacted the Iowa ICWA to fulfill goals similar to the federal counterpart, namely, to protect tribal relations and the best interests of the child by promoting practices that are either designed to prevent removal or out-of-home placement, or if such removal or placement becomes necessary, do it in a way that can help the child establish and maintain a relationship with his or her tribal culture and heritage. Section 232B.2 also emphasizes that Iowa is committed to following the federal ICWA and "other applicable law." *Id.*

The Iowa ICWA has a provision related to the best interests of the child that is consistent with the overall purpose of preserving Native American culture and heritage. Specifically, section 232B.3 defines best interests of the child as:

> the use of practices in accordance with the federal Indian Child Welfare Act, this chapter, and other applicable law, that are designed to prevent the Indian child's voluntary or involuntary out-of-home placement, and whenever such placement is necessary or ordered, placing the child, to the greatest extent possible, in a foster home, adoptive placement, or other type of custodial placement that reflects the unique values of the child's tribal culture *and is best able to assist the child in establishing, developing, and maintaining a political, cultural, and social relationship with the Indian child's tribe and tribal community.*

*Id.* § 232B.3(2) (emphasis added). Clearly, under the Iowa definition, best interests of the child refers to practices designed to promote the establishment and maintenance of the relationship between the child and the tribal community. Specifically, the best interests of the child is to be determined by the use of practices "in accordance with the federal Indian Child Welfare Act." *Id.* Plainly, the Iowa statute is designed to operate in tandem with, and not in opposition to, related federal law.

2. *Provision related to transfer of jurisdiction in Iowa ICWA.* Iowa Code section 232B.5 relates to the transfer of jurisdiction from state courts to tribal courts in Indian child welfare matters. That section provides that "[t]he federal Indian Child Welfare Act and this chapter are applicable without exception in any child custody proceeding involving an Indian child." *Id.* § 232B.5(2). Further, the Iowa ICWA provides procedural protections to the Indian parents and their tribes, such as a presumption of Indian child identity and provisions for timely

and sufficient notice not explicitly present in the federal ICWA. *See id.* § 232B.5(3)–(9).

On the question of transfer of jurisdiction, Iowa Code section 232B.5(10) states:

> 10. Unless either of an Indian child's parents objects, in any child custody proceeding involving an Indian child who is not domiciled or residing within the jurisdiction of the Indian child's tribe, the court shall transfer the proceeding to the jurisdiction of the Indian child's tribe, upon the petition of any of the following persons:
>
> (*a*) Either of the child's parents.
>
> (*b*) The child's Indian custodian.
>
> (*c*) The child's tribe.

Note that under the statute, the persons entitled to object are limited to the parents and do not expressly include the child or the child's representative. Any party can challenge whether good cause should prevent transfer under section 232B.5(13), but only the parents have a right to object to a transfer request.

In addition to limiting who may object, the Iowa ICWA limits what might amount to good cause to deny transfer:

> 13. If a petition to transfer proceedings as described in subsection 10 is filed, the court shall find good cause to deny the petition *only* if one or more of the following circumstances are shown to exist:
>
> . . . .
>
> (*c*) Circumstances exist in which the evidence necessary to decide the case cannot be presented in the tribal court without undue hardship to the parties or the witnesses, and the tribal court is unable to mitigate the hardship by making arrangements to receive and consider the evidence or testimony by use of remote communication, by hearing the evidence or testimony at a location

convenient to the parties or witnesses, or by use of other means permitted in the tribal court's rules of evidence or discovery.

(*d*) An objection to the transfer is entered in accordance with subsection 10.

*Id.* § 232B.5(13) (emphasis added). Assuming "only" means "only," it is clear that under the Iowa ICWA, transfer to tribal court is to occur unless a qualified person objects or there is good cause as narrowly allowed by this section.

**D. Relevant Iowa Caselaw.** There are two relevant Iowa cases that merit discussion. The first is *In re N.V.*, 744 N.W.2d 634. This court in *In re N.V.* recognized that that Iowa Code section 232B.5(10) and (13) does not provide for a "best interests" of the child exception to transfer. *Id.* at 638. Second, the *In re N.V.* court recognized that the Iowa ICWA does not use best interests of the child in the traditional sense. *Id.* Instead, *In re N.V.* declared that "it is in a child's best interest to place him or her in a home that will preserve the unique values of the child's tribal culture and assist the child in establishing relationships with the tribe and tribal community." *Id.* at 638–39.

If statutory interpretation were the end all and be all, *In re N.V.* would dispose of the case. Still, there is a constitutional overlay not considered in *In re N.V.* Specifically, does the statute, as interpreted in *In re N.V.*, satisfy procedural and substantive due process?

These constitutional issues were not presented in *In re N.V.*, but they were presented to the court of appeals in the subsequent case of *In re J.L.*, 779 N.W.2d 481. The juvenile court and the court of appeals both relied on *In re J.L.* in this matter.

In *In re J.L.,* the state filed a petition to terminate parental rights with respect to three children. *Id.* at 484. The Winnebago Tribe of Nebraska intervened in the proceeding and filed a motion to transfer the case to tribal court. *Id.* The children's guardian ad litem objected to the transfer. *Id.* The guardian ad litem asserted that the children could object to the transfer and that the juvenile court could consider the best interests of the children in determining whether to transfer the case to tribal court. *Id.* The guardian ad litem argued that if the Iowa ICWA precluded the children from contesting the transfer, the statute violated their procedural due process. *Id.* at 488. Further, the guardian ad litem asserted that if the Iowa ICWA precluded the juvenile court from considering the children's best interests in determining the transfer issue, the statute violated their substantive due process. *Id.*

*In re J.L.* began its analysis by canvassing the relevant federal and Iowa statutory provisions. *Id.* at 485–86. With respect to the federal ICWA, the *In re J.L.* court noted that under BIA guidelines, "any party," apparently including children, could object. *Id.* at 486. Further, under the federal law, *In re J.L.* recognized a split in the caselaw on the question of whether a state court could consider the best interests of the child in determining whether to transfer a case to tribal court. *See, e.g., In re Appeal in Maricopa Cnty. Juv. Action No. JS–8287,* 828 P.2d 1245, 1251 (Ariz. Ct. App. 1991); *In re Robert T.,* 246 Cal. Rptr. 168, 175 (Ct. App. 1988); *In re Adoption of T.R.M.,* 525 N.E.2d 298, 308 (Ind. 1988); *In re N.L.,* 754 P.2d 863, 869 (Okla. 1988); *In re J.L.,* 654 N.W.2d 786, 792–93 (S.D. 2002) (per curiam). *But see People In re J.L.P.,* 870 P.2d 1252, 1258 (Colo.

App. 1994); *In re Armell*, 550 N.E.2d 1060, 1065–66 (Ill. App. Ct. 1990); *C.E.H. v. L.M.W.*, 837 S.W.2d 947, 953–54 (Mo. Ct. App. 1992); *In re A.B.*, 663 N.W.2d 625, 633–34 (N.D. 2003).

Turning to the Iowa ICWA, however, *In re J.L.* noted the statute took a narrower approach than federal law. First, it noted that under section 232B.5(10) there is no provision for children to object to transfer. *In re J.L.*, 779 N.W.2d at 487. Further, the *In re J.L.* court observed that under section 232B.5(13), there are "only" four grounds to deny a transfer petition for good cause, which do not include "best interests" of a child. *Id.*

Deciding that the provisions were overly limiting, the *In re J.L.* court found that Iowa Code section 232B.5(10) violated the children's procedural due process rights because it did not allow them to object to a transfer motion or otherwise participate in a transfer proceeding. *Id.* at 488–89.

The *In re J.L.* court then turned to the question of whether the children could assert that transfer to tribal court was not in their best interests. *Id.* at 491. It noted that "the children's interest in familial association" had been recognized as "a fundamental liberty interest" protected by the Due Process Clause. *Id.* The court of appeals next considered whether the Iowa ICWA provisions "only" permitting other matters to be raised in a transfer proceeding was narrowly tailored to serve a compelling state interest. *Id.* at 490–91. The *In re J.L.* court noted that by completely prohibiting children from asserting their rights, the statute places the rights of the tribe above the rights of the Indian child. *Id.* at 491. As a result, it concluded that the Iowa limitation on the grounds

of transfer violated the substantive due process right of children to assert their best interests in a transfer proceeding. *Id.* at 492.

The *In re J.L.* court closed by asserting that its holding did not undermine the policies of either the Iowa or federal ICWA, because the federal ICWA was "not designed to completely prohibit consideration of a child's circumstances or rights." *Id.* The court in *In re J.L.* asserted that the statute evidences a dual purpose, to protect the best interests of the child and to preserve the Native American culture, and it emphasized that neither the Iowa nor federal ICWA suggested the children's rights should be eliminated in favor of federal rights. *Id.*

**V. Did the Juvenile Court Properly Deny Transfer to Tribal Court?**

**A. Introduction.** Both Father and the Tribe claim the juvenile court erred in denying their separate requests to transfer jurisdiction of the child-welfare cases to the tribal court. The Tribe questions the right of the children's guardian ad litem to object to the transfer and, even if allowed, maintains there was not good cause to deny the request of Father and the Tribe. Applying the standard outlined in both 25 U.S.C. § 1911(b) and Iowa Code section 232B.5(13), Father and the Tribe argue that none of the permissible criteria for good cause to deny transfer to tribal court has been met.

Father also asserts that *In re J.L.* was wrongly decided. According to Father, the purpose of the ICWA statutes was to address the alarmingly high rate of Native American children being removed from the home. *See Holyfield*, 490 U.S. at 32. The decision in *In re J.L.*, according to Father, is an obstacle to achieving the statutory goal.

The Tribe offers a slightly different perspective. The Tribe asserts that perhaps at some point the children may have a due process interest, but not in a transfer proceeding. The only question in the transfer decision is which forum is going to handle the substantive issues, not the merits of the substantive issues themselves. Thus, the reasoning in *In re J.L.* does not apply to a transfer proceeding.

In response, the guardian ad litem argues that *In re J.L.* gave children both substantive and procedural due process rights to voice their objection on the transfer of jurisdiction. *In re J.L.*, 779 N.W.2d at 489. Additionally, the guardian ad litem claims that the Tribe's motion to transfer came in too late, suspecting that the Tribe only wanted to transfer jurisdiction after the State had filed its petition for termination of parental rights. The guardian ad litem thus echoes the finding of the juvenile court that the effort by the Tribe to transfer the case came "at an advanced stage" of the proceedings.

The guardian ad litem asserts that in situations where the "child's best interests may override tribal or family interest . . . specific preferences of the tribe or family should not be followed." *In re D.S.*, 806 N.W.2d at 472. Most of guardian ad litem's arguments focus on the placement of both children, believing that it would be in the best interests of both T.F.s to remain in the house of the current foster family, given evidence was presented at the motion for transfer hearing that the Tribe was not aware of the services or needs of each individual child, or the parents. The guardian ad litem further argues that the Tribe fails to meet its burden on the motion to transfer. Lastly, the guardian ad litem urges the court

to uphold *In re J.L.*, believing that "[i]n failing to allow Indian children to do so, the Tribe's rights would supersede the rights of Indian children to have safety, stability, and permanency. Such an outcome would have grave consequences for these children in interest, as well as other Indian children involved in CINA or TPR proceedings."

Finally, the State asserts that Father's appeal was not timely. In addition, the State maintains the appeal of both Father and the Tribe were untimely because the order denying transfer was a final order that was not appealed in a timely fashion. The State takes no position, however, on the questions of whether the children may challenge a motion to transfer and whether the best interests of the children may be considered in the resistance to transfer.

**B. Discussion.**

1. *Does the refusal to consider the best interests of the child violate substantive due process?* As noted above, the gist of *In re J.L.* is that under both federal and Iowa ICWA, because children are not permitted to resist transfer to tribal court on the ground that such a transfer would not be in their best interests, the statutes violated substantive due process. *In re J.L.*, 779 N.W.2d at 492. In order to determine the validity of the holding in *In re J.L.*, we must resolve two questions. The first statutory question is whether, under the ICWA statutes, the child is allowed to challenge transfer to tribal court based on a best interests claim. If the answer to this statutory question is no, a constitutional question arises. Namely, if the ICWA statutes do not permit a child to raise a best interests claim in a transfer proceeding, does such a restriction violate

substantive due process? The court of appeals in *In re J.L.* answered "no" to the statutory question of whether a child could raise a best interests challenge to transfer to tribal court and "yes" to the question of whether substantive due process was violated. We agree with the court of appeals on the statutory question, but find that the statutes so interpreted do not violate substantive due process.

State courts have struggled with the statutory question of whether federal or state ICWA statutes permit a child to raise a best interests challenge to transfer to tribal courts. In *In re N.V.*, 744 N.W.2d 634, we answered the question. After surveying the terms of the federal and state ICWA statutes, we concluded that the statutes did not permit a child to challenge transfer on best interests grounds. *Id.* at 638–39.

A number of other courts agree with our position. However, what is important is not the mere fact of agreement, but the reasoning employed. For instance, in *In re A.B.*, 663 N.W.2d at 633–34, the North Dakota Supreme Court stated:

> Although one of the goals of ICWA is to protect the best interests of an Indian child, the issue here is the threshold question regarding the proper forum for that decision. We agree with those courts that have concluded the best interest of the child is not a consideration for the threshold determination of whether there is good cause not to transfer jurisdiction to a tribal court.

(Citations omitted.) The essential point in *In re A.B.* is that the transfer question is a preliminary, jurisdictional question. In *In re Zylena R.*, the Nebraska Supreme Court overruled its precedent and held that "recognizing best interests as 'good cause' for denying transfer permits state courts to decide that it is not

in the best interests of Indian children to have a tribal court determine what is in their best interests." 825 N.W.2d 173, 186 (Neb. 2012). As similarly observed by an Illinois appellate court, "[C]onsiderations involving the best interests of the child are relevant not to determine jurisdiction but to ascertain placement." *In re Armell*, 550 N.E.2d at 1065. On a related but somewhat different note, a Texas appellate court observed that applying the best interests standard to transfer decisions would "defeat[] the very purpose for which the ICWA was enacted, in that, it allows Anglo cultural biases into the analysis." *Yavapai-Apache Tribe v. Mejia*, 906 S.W.2d 152, 169 (Tex. App. 1995); *see also People In re J.L.P.*, 870 P.2d at 1257–58 (concluding that adoption of best interests of child would defeat the purpose of ICWA); *C.E.H.*, 837 S.W.2d at 953–54 (agreeing with the *In re Armell* court that best interests of the child considerations are inapplicable to ICWA's jurisdictional analysis of transfer); *In re Adoption of Halloway*, 732 P.2d 962, 971–72 (Utah 1986) (concluding that issue of bonding and placement of the child are not proper considerations when deciding jurisdiction). *But see In re T.S.*, 801 P.2d 77, 80 (Mont. 1990) (holding that best interests of the child test will be applied in determining good cause to transfer); *In re Adoption of S.W.*, 41 P.3d 1003, 1011–14 (Okla. Civ. App. 2001) (deciding best interests of the child is relevant in deciding whether to transfer jurisdiction).

Under the BIA guidelines, "good cause not to transfer the proceeding may exist if . . . [t]he Indian child is over twelve years of age and objects to the transfer." Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. at 67591. But here, there are no objecting children over the age of twelve.

Thus, at this stage, the proper question is purely a jurisdictional one: which tribunal should handle the matter. *See In re Zylena R.*, 825 N.W.2d at 184–86. As noted in our discussion of whether an appeal from an order denying transfer is interlocutory, the question of good cause to prevent transfer invokes what has been called a "modified forum non conveniens" claim. The primary consideration is whether or not the case can be tried in tribal courts without undue hardship to the parties and witnesses. *See C.E.H.*, 837 S.W.2d at 953–54 (citing *Chester Cnty. Dep't of Soc. Servs. v. Coleman*, 399 S.E.2d 773, 775 (S.C. 1990) (per curiam)). In the transfer decision, the best interests of the child has no bearing.

Aside from the statutory analysis we discussed in *In re N.V.*, prematurely including the best interests of the child in a jurisdictional discussion would risk "alter[ing] the focus of the case." *Mejia*, 906 S.W.2d at 170. "[T]he issue becomes not what judicial entity should decide custody, but the standard by which the decision itself is made." *Id.* Further, doing so would "negate[] the concept of 'presumptively tribal jurisdiction' over Indian children." *In re Zylena R.*, 825 N.W.2d at 186.

In short, there can be no substantive due process violation arising from a statute that refuses to allow a party to present on an issue irrelevant to the proceeding. To that extent, we overrule the holding of *In re J.L.*

As a result, we are free to apply the statutory provisions of ICWA as interpreted in *In re N.V.* Turning our attention back to the present case, the Tribe petitioned to transfer the case per Iowa Code section 232B.5(10) on January 30,

2020. Absent objection from either parent, the juvenile court must transfer the case unless a challenging party presents good cause to overcome the Tribe's presumptive jurisdiction under section 232B.5(13). Under section 232B.5(13)(*c*), the Iowa ICWA requires a similar analysis to forum non conveniens, finding good cause to deny when circumstances exist where there would be an undue hardship to the parties and the tribal court unable to mitigate the hardship. Iowa Code § 232B.5(13).

Records show that no such undue hardship exists in this case. The Tribe was willing and able to use telecommunication technology to conduct hearings. They have been using similar technology already. Moreover, the Tribe is not geographically remote from the parties involved as to constitute a hardship as the parties and the juvenile court are only 170 miles away from the tribal court in Macy, Nebraska. A two hour distance would not be considered hardship under section 232B.5(13)(*c*).

In conclusion, if there is no objecting child above the age of twelve, we hold that the transfer provisions of ICWA which do not permit a child from raising the best interests of the child to oppose transfer does not violate substantive due process.

2. *Burden of proof.* According to the BIA guidelines, the burden of establishing good cause to deny a transfer is upon the party opposing the transfer. Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. at 67591. While it is true that BIA guidelines are not binding, they are persuasive. *Batterton v. Francis*, 432 U.S. 416, 425–26 (1977) (noting guidelines

are accorded great weight); *In re N.V.*, 744 N.W.2d at 638; *see also In re Junious M.*, 193 Cal. Rptr. 40, 43 n.7 (Ct. App. 1983) (noting guidelines entitled to "great weight"); *In re H.D.*, 729 P.2d 1234, 1238 (Kan. Ct. App. 1986) (noting guidelines establish pretrial requirements); *In re Dependency & Neglect of N.A.H.*, 418 N.W.2d 310, 311 (S.D. 1988) (per curiam) (holding "better practice" to follow the guidelines).

Here, the guardian ad litem as the party opposing the transfer of jurisdiction to the Tribe bears the burden of overcoming the Tribe's presumptive jurisdiction and establishing good cause not to transfer the matter. *In re Armell*, 550 N.E.2d at 1064. Based upon our review of the record, the guardian ad litem failed to establish good cause to prevent transfer to the tribal court under the ICWA statutory and regulatory criteria.

3. *Advanced stage of the proceeding.* The guardian ad litem and the State also raise an alternative argument for establishing good cause, arguing that the Tribe's petition to transfer was filed at an advanced stage of the proceedings. The guardian ad litem and the State assert that there was a significant delay between the time the Tribe intervened in the CINA proceedings and the motion to transfer jurisdiction. The guardian ad litem and the State claim that the Tribe waited until the termination-of-parental-rights petition was filed and that to permit a transfer at this late stage of the proceedings would adversely affect the children's best interests.

The BIA guidelines provide that good cause not to transfer a case to a tribal court may exist if the request to transfer is made "at an advanced stage . . . and

the petitioner did not file the petition promptly after receiving notice of the hearing." Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. at 67591. BIA guidelines further state: " '[A]dvanced stage' refers to the proceeding, rather than the case as a whole. Each individual proceeding will culminate in an order, so 'advanced stage' is a measurement of the stage within each proceeding." Indian Child Welfare Act Proceedings, 81 Fed. Reg. at 38825.

Consistent with the above language, the BIA regulations distinguish between "foster-care" and "termination" proceedings. 25 C.F.R. § 23.115(b). Thus, the beginning of a termination proceeding begins when the petition for termination is filed, not at some earlier point. *See In re Welfare of the Child. of R.M.B.*, 735 N.W.2d 348, 352 (Minn. Ct. App. 2007); *In re Zylena, R.*, 825 N.W.2d at 182; *In re A.B.*, 663 N.W.2d at 632; *People In re C.R.W.*, 962 N.W.2d 730, 744–46 (S.D. 2021).

This distinction makes sense. In a foster care proceeding, the custodial arrangements are often temporary and subject to change. But when a termination petition is field, the Tribe's interest is much greater. It is reasonable for the Tribe to simply participate in proceedings prior to the filing of a termination petition and then seek to transfer when the stakes are escalated by the filing of a termination petition. *See In re Welfare of the Child. of R.M.B.*, 735 N.W.2d at 352; *In re Zylena R.*, 825 N.W.3d at 183.

Here, the petition for termination of parental rights was filed on January 23, 2020. The Tribe moved to transfer the case on January 30.

Therefore, even under the BIA guidelines, the motion to transfer jurisdiction did not come at the eleventh hour of the termination proceedings.

Because we hold that the denial of transfer of jurisdiction was improper, we do not proceed to the discussion on the juvenile court's decision to terminate Father's parental rights.

**VI. Conclusion.**

In an ICWA proceeding, the United States Supreme Court observed that "we must defer to the experience, wisdom, and compassion of the . . . tribal courts to fashion an appropriate remedy" in Indian child welfare cases. *Holyfield*, 490 U.S. at 54 (quoting *In re Adoption of Halloway*, 732 P.2d at 972). These observations apply in this case.

For the foregoing reasons, we hold that the juvenile court erred in denying the Tribe's motion to transfer jurisdiction. The juvenile court's order on termination of Father's parental rights is vacated. The case is remanded to the juvenile court for transfer to the tribal court.

**DECISION OF COURT OF APPEALS VACATED; JUVENILE COURT JUDGMENT REVERSED AND REMANDED WITH INSTRUCTIONS.**

Christensen, C.J., and Mansfield and Oxley, JJ., join this opinion. McDermott, J., files a concurrence in part and dissent in part, in which Waterman and McDonald, JJ., join.

**McDERMOTT, Justice (concurring in part and dissenting in part).**

Two parties seek review of the juvenile court's ruling in this appeal: the Omaha Tribe of Nebraska & Iowa (Tribe) and the children's father. The Tribe timely filed its appeal, and I join in full the majority's opinion holding in the Tribe's favor that the juvenile court erred in denying the Tribe's motion to transfer jurisdiction to the tribal court.

But the father filed his notice of appeal after the jurisdictional deadline. The majority took up the father's appeal nonetheless under our burgeoning "delayed appeal" jurisprudence in juvenile cases. I respectfully dissent from the court's grant of the father's delayed appeal for all the reasons stated in my concurrence in part and dissent in part in *In re A.B.*, 957 N.W.2d 280, 301–05 (Iowa 2021) (McDermott, J., concurring in part and dissenting in part). Appeal deadlines, it bears repeating, are "mandatory and jurisdictional." *Root v. Toney*, 841 N.W.2d 83, 87 (Iowa 2013) (quoting *In re Marriage of Mantz*, 266 N.W.2d 758, 759 (Iowa 1978)). We lack jurisdiction to hear the father's appeal and should dismiss it without reaching the merits of his argument. *In re J.H.*, 952 N.W.2d 157, 165 (Iowa 2020) (dismissing a mother's appeal from a juvenile court ruling "because it was untimely"). For these reasons, I concur in the majority's opinion as to the Tribe's appeal but dissent as to the father's appeal.

Waterman and McDonald, JJ., join this concurrence in part and dissent in part.